Filed 1/12/21  Marriage of Carre CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of SUSAN and STEPHEN L. CARRÉ. | D076813 |
| SUSAN R. CARRÉ, | |
| Appellant, | (Super. Ct. No. DN160594) |
| v. | |
| STEPHEN L. CARRÉ, | |
| Respondent. | |

APPEAL from an order of the Superior Court of San Diego County, James A. Mangione, Judge.  Affirmed.

Susan R. Carré, in pro. per., for Appellant.

Stephen L. Carré, in pro. per., for Respondent.

Pettit Kohn Ingrassia Lutz & Dolin, Douglas A. Pettit and Matthew C. Smith, for Minors' Counsel Heather Milligan.

The family court on December 6, 2018, appointed attorney Heather Milligan as counsel for teenage minors B.C. (born 2003) and S.C. (2005) because of the "high conflict child custody" dispute between their parents,

appellant Susan R. Carré and her former husband respondent Stephen L. Carré. On September 20, 2019, after interviewing minors in camera with the parties' consent, the court at an unreported[1] hearing denied Susan's separate motions for full legal custody of minors and to dismiss attorney Milligan as minor's counsel.

On appeal, Susan, appearing in propria persona as she did in the family court, claims the court abused its discretion in denying her motions. Specifically, Susan claims the court failed to recognize the abuse of minors by Stephen and therefore did not consider their best interest in denying her full legal custody. She also claims the court erred in refusing to dismiss minor's counsel, despite her showing of "good cause" for such dismissal. As we explain, we reject Susan's claims and affirm the court's order.

FACTUAL AND PROCEDURAL OVERVIEW

Susan and Stephen have been engaged in an ongoing family court matter for about a *decade*. As relevant to this appeal, the court at a December 6, 2018 hearing denied for lack of evidence Susan's request for a domestic violence restraining order, which request she had filed on November 14 on behalf of herself and minors.

At this hearing the court also appointed attorney Milligan as minor's counsel, explaining as follows its reason for doing so: "The incidents and conduct described [in the request for restraining order] relate to C/V [i.e., custody and visitation] issues . . . in which the children have been placed directly in the middle of the parent's high-conflict. The Court has concerns about allegations re father's conduct and behaviors toward mother and the children—as well as the impact on the children—but that on this evidence,

---

[1] Unless otherwise indicated, all of the hearings in this case were unreported.

2

the burden of proof has not been met. The Court also has concerns that the DVTRO [i.e., domestic violence temporary restraining order] process may have proceeded as *leverage* for C/V orders. The Court finds appropriate C/V orders exist and a pending evidentiary hearing remains on calendar." (Italics added.)

Susan's request for a domestic violence restraining order was precipitated by her October 23, 2018 ex parte application for an emergency order regarding custody. Susan claimed it was necessary for her to assume full temporary custody over minors until they could be interviewed by Family Court Services (FCS). Susan based her request on an incident that occurred in September between S.C. and her father. According to Susan, in this incident S.C. messaged her mother stating she wanted to come home early from a visit. When Stephen saw S.C.'s message, Susan alleged he had an "outburst," cursed and yelled at S.C., and caused S.C. to become fearful and believe he might "hurt" her.

Susan claimed a change in custody was also needed based on another incident that occurred in early October when Stephen and his wife unexpectedly showed up at a football game where S.C. was cheering. According to Susan, S.C. "has never felt comfortable with her own father watching her cheer, has described it as 'creepy,' and has said she feels as though he is judgmentally glaring at her." (Emphasis omitted.) At halftime, Susan contacted Stephen, telling him he was making S.C. uncomfortable and suggesting he apologize to S.C. for the September incident. According to Susan, Stephen replied, "that's B.S." and "I don't need to apologize for SHIT."

Susan in her October 23 ex parte application added that in May 2018, S.C. awakened in a panic, telling her mother that she was having suicidal thoughts. About a week later, Susan received a call from S.C.'s school

3

counselor after other students expressed concern S.C. might "hurt herself." Susan claimed both S.C. and B.C. have had "thoughts of suicide and personal bouts of anger in the home," which she further claimed "coincided with episodes of neglect and mental abuse by [Stephen]."

After S.C.'s disclosure about suicide, she started seeing a family therapist. According to Susan, B.C. also started counseling in 2016 after she too had discussed suicide. Although Stephen wanted to take his daughters to counseling, Susan claimed that minors "begged" her not to force them to attend counseling with their father and stepmother, which Susan concluded was a "disturbing red flag about the maltreatment" of minors by Stephen and his wife.

The ex parte application also described other incidents to support Susan's claim it was in minors' best interest that she have full temporary custody. Susan also alleged that for "several years" B.C. had "beg[ged]" her to request full custody over her and her sister.

The court on October 24 kept the status quo as to custody and set the matter for hearing on November 15. On October 24 Susan filed a request for order seeking among other relief a change in child support and asking the court to order Stephen to attend anger management classes.

The day before the November 15 hearing, Susan filed her request for a domestic violence restraining order, as noted. Susan's request for a restraining order generally relied on the same set of facts—with the exception of some additional e-mail correspondence between Susan and

4

Stephen,[2] and text messages between B.C. and Stephen[3] —that she used to support her October 23 ex parte request for full temporary custody of minors.

Less than a month after the court denied her request for a domestic violence restraining order, Susan renewed that request, again on behalf of herself and minors, based on an incident that took place on December 23. Susan claimed Stephen, while hugging and saying goodbye to S.C., allegedly ran his hand down his daughter's back and touched her "butt," causing S.C. to be "creeped" out and leading S.C. to suffer severe "mental/emotional" injury. Susan also claimed B.C. complained of being touched "inappropriately" by her father. (Emphasis omitted.) In connection with her request for a restraining order, Susan renewed her request for full custody of minors. Susan also reported the December 23 incident to child welfare services (CWS) and law enforcement.

The court on December 28 granted Susan a temporary restraining order, provisionally awarded her full legal and physical custody of minors, and denied Stephen visitation. The court set the matter for a full hearing on

---

[2] The e-mail correspondence is dated November 10, 2018. The correspondence shows a series of vitriolic e-mails beginning with an incident that occurred that day at one of B.C.'s games, which led Susan to call law enforcement. The back-and-forth e-mails also detail myriad incidents of alleged abuse by *both* parties over the course of years.

[3] The text messages show Stephen apologizing to B.C. about the November 10 incident at the playing field; Stephen telling B.C. how much he loved her; and Stephen informing B.C. that he has to "fight" to spend time with her and her sister and has had to do so for eight years. In one of his messages a few days later, Stephen told B.C. he missed her and wished they were "hanging out" together, to which B.C. responded, "Miss u too." In another message Stephen told B.C. it was *her* decision to make whether to visit with him, not her mother's. B.C. messaged back, "Idk [i.e., I don't know] I just don't want to be put in the middle of it."

January 10, 2019, which at Stephen's request was continued to January 25. On January 25, Susan requested the hearing be continued for eight weeks based on the ongoing investigation of Stephen by CWS and the "sex crimes" division of the San Diego Police Department. The court ordered the hearing continued to March 14, 2019.

On March 1, 2019, Susan renewed her request for full legal custody of minors. In support of her request, Susan relied on the fact that Stephen was then subject to a restraining order and was being investigated by CWS and law enforcement; that the change in custody was necessary given the seriousness of Stephen's actions and behaviors; and that "placing the teenagers in their father's care poses an immediate risk and danger to the[ir] emotional and mental health."

Susan's March 1 request for custody was accompanied by a nine-page declaration and 22 exhibits.[4] Other than the allegations of inappropriate touching, Susan's declaration described many of the same or similar alleged behaviors and actions by Stephen and/or his wife that were the basis of her October 23, 2018 request for full legal custody of minors.

At the March 4, 2019 hearing, the court again denied for lack of evidence Susan's request for a domestic violence restraining order. The court found Susan did not show by a preponderance of the evidence that "abuse" occurred within the meaning of Family Code[5] section 6203, subdivision (a)[6]

_____

[4]     The exhibits attached to the March 1 request for order are not included in the record.

[5]     All further statutory references are to the Family Code unless otherwise noted.

6

of the Domestic Violence Prevention Act (DVPA; Fam. Code, § 6200 et seq.)
The court also found that Stephen did not intentionally or recklessly cause or attempt to cause "bodily injury" or "engage in any stalking/harassing/other behavior prohibited" under the DVPA, "including disturbing the mental or emotional calm of [Susan]"; and that Susan was not in "reasonable apprehension of imminent serious bodily injury" to herself or "another" party.

As before, the court also found the incidents and conduct described in Susan's December 28 request for a restraining order related to "custody and visitation issues in which the children have been placed directly in the middle of the parent's high conflict." While "concern[ed]" about Stephen's behavior toward Susan and minors, the court again expressed "concern" that Susan may have used the "DVTRO process . . . as leverage for C/V orders." The court found the existing custody and visitation order was appropriate and set the matter for further hearing on March 14.

Stephen on March 8 filed a responsive declaration in opposition to Susan's request for full custody of minors. In his declaration, Stephen addressed the allegations of sexual assault raised by Susan in her renewed request for a domestic violence restraining order. He noted "all investigations" by CWS and law enforcement were "closed with no substantiated abuse or criminal charges." Stephen further claimed that Susan made up these allegations in order to obtain increased parenting time with minors and therefore, more child support.

---

6      Abuse includes "intentionally or recklessly caus[ing] or attempt[ing] to cause bodily injury"; "[s]exual assault"; "plac[ing] a person in reasonable apprehension of imminent serious bodily injury to that person or to another"; and "engag[ing] in any behavior that has been or could be enjoined" under section 6320. (Fam. Code, § 6203, subd. (a).)

7

Stephen also raised concerns about Susan's involvement of minors in the parties' ongoing custody and visitation issues. He noted: "In her declaration filed with the court March 1, 2019, Petitioner details the conversations she has been having with our daughters which is clearly in violation of the court's orders regarding communication with our children and very inappropriate. The children have an attorney who[se] job it is to discuss with them the case and their positions in the case. It appears Petitioner is alleging Ms. Milligan is not doing her job in allowing the children to testify to what I believe is a witch[-]hunt, she is clearly manipulating our children and coaching them on what they should or should not be saying or doing. I am very concerned about the children in her care and it may be time for a[n Evidence Code section] 730[7] custody evaluation based on her latest statements to the court signed under penalty of perjury."

At the March 14 hearing on Susan's request for change order regarding custody, the record shows the parties entered into a stipulation concerning

---

7    Evidence Code section 730 provides: "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required. The court may fix the compensation for these services, if any, rendered by any person appointed under this section, in addition to any service as a witness, at the amount as seems reasonable to the court. [¶] Nothing in this section shall be construed to permit a person to perform any act for which a license is required unless the person holds the appropriate license to lawfully perform that act."

visitation based in part on a March 12, 2019, 12-page confidential[8] report of FCS (hereinafter, FCS report). The FCS report noted that this was the parties fifth conference at FCS since 2010; that each party expressed myriad concerns about the other party, as summarized *ante*; and that both parties discussed a possible parenting schedule, with Susan stating she wanted sole legal custody of minors, and Stephen proposing a visitation schedule in which they would share legal custody of minors, and in which he would participate in conjoint therapy with minors.

The FCS report also summarized an interview of minors that took place on January 9, 2019. According to the interviewer, minors were willing to visit with their father, including overnights. Based on the minors' interview, the FCS report concluded that Susan had inappropriately involved minors in the parties' conflict, and that Stephen at times had yelled at and insulted minors, and had anger outbursts.

The FCS made a number of recommendations, including that the parties would share legal custody of minors if the restraining order was dismissed (as turned out to be the case); that Susan would have primary physical custody of minors, with parenting of minors based on a proposed visitation schedule, as noted; that both parties were to participate in individual counseling with a licensed mental health professional; and that S.C. and Stephen would participate in conjoint counseling with a licensed mental health professional.

In its March 14 minute order, the court confirmed its earlier ruling denying Susan's renewed request for a domestic violence restraining order. The minute order further provided that "any future requests for a restraining

---

[8] The FCS report is included in the record. Given its confidential nature, we merely summarize various points in that report relevant to the issues on appeal.

order [by Susan] shall *not* include any allegations prior to today's date." (Italics added.) The March 14 minute order also adopted with modification the recommendations made in the FCS report, as further agreed to by the parties in their stipulation.

Susan on April 9 filed an ex parte application to set aside the March 14 order. Susan's April 9 application included 19 exhibits.[9] Susan stated ex parte relief was necessary because minors wanted to speak to the court directly before going into a "potentially harmful environment" with their father. The next day the court denied Susan's request for ex parte relief, noting these issues "have been addressed."

Less than a month later, Susan renewed her request for full custody of minors. In her May 3 request, Susan asked the court to order "emergency [FCS] interviews with the children and parties," and for Stephen to undergo an Evidence Code section 730 evaluation. Susan's request included 22 different reasons why the court should grant her relief. The request was set for hearing on June 21.

On May 24, Susan lodged 28 exhibits[10] in support of her May 3 request. She also separately filed an income and expense declaration. In the latter declaration, Susan sought additional child support because over the previous nine months minors had been living with her 95 percent of the time.

Susan on June 14 filed a declaration regarding notice of request for temporary emergency ex parte orders. Stephen on June 18 moved for his own ex parte relief against Susan based on her failure to follow court orders by continuing to speak with minors about the court-ordered visitation plan. On

---

[9]     None of these exhibits are included in the record.

[10]     As before, none of these exhibits are included in the record.

10

June 19, the court found no emergency orders were warranted, setting the matter for further hearing.

On June 21, Susan filed an ex parte application in support of her request to "replace minor's counsel . . . prior to any future hearings and to ha[lt] dealings/interactions with the teenagers" among other relief. Susan also requested minors be allowed to testify without minor's counsel present.

In her application, Susan claimed attorney Milligan had not been acting in the best interest of minors, had been interfering in minors' therapy without their consent, had proven to be "extremely biased," and has "lacked professionalism," all of which Susan claimed was causing the "teenage children . . . to suffer." Attached to Susan's June 21 request were two type-written letters, one signed by B.C. only, and the other signed by both girls.

The two-page April 21 letter asks the court to reconsider its visitation order because there allegedly had "been no changes or improvements with what we see of our dad[']s behavior and actions." The letter concludes with a request that the court speak with minors before forcing them to begin visits with their father "in 2 weeks, less than that by the time this letter reaches you." This letter is signed by both girls.

The first line in the June 17 letter reads, "I am writing to you because my sister and I would like a new lawyer and I do not want our father to take *full* custody."[11]  (Italics added.)  The letter goes to explain why B.C. and her sister "cannot trust" attorney Milligan, including because neither B.C. nor S.C. are comfortable visiting their father, as he was "lying a lot, whether it's

---

[11]    We note from the court's earlier ruling that the parties would share legal custody of minors, with Stephen having visitation as ordered by the court and as agreed to by the parties in their stipulation, with Susan having primary physical custody.  The record shows Stephen never requested full custody of minors.

11

in the documents, out of the documents, to [her] face, and more." The letter concludes by asking the court for "help," and is signed only by B.C.

Susan followed up her June 21 ex parte request to dismiss attorney Milligan as minor's counsel with a more detailed June 24 application for such relief. The court set the matter for hearing on July 31. Susan's lengthy application again accused minor's counsel of being untrustworthy, including "blocking the children's voices from being heard in court." (Emphasis omitted.) Susan also alleged minor's counsel had "concealed evidence of shameful betrayal of her clients' interest despite her professional oath"; had "failed to present her personal knowledge and physical evidence that supports the just cause for both previously issued restraining orders"; had "obtained personal disclosures from both of her minor clients"; and had failed to be a "neutral fact finder," instead imposing her will on minors while "bad-mouth[ing]" Susan. In support of her June 24 detailed application to remove minor's counsel, Susan lodged nine exhibits.[12]

Stephen opposed Susan's request to dismiss minor's counsel, modify child custody and visitation, and require minors to undergo "emergency" FCS interviews and him an Evidence Code section 730 evaluation. Stephen again expressed concern that, despite the court's previous admonishment and orders, Susan continued to involve minors in the parties' custody and visitation issues, and to coach them on what they should or should not be saying or doing on such issues; and that Susan was interfering in the attorney-client relationship between attorney Milligan and minors, including by reading text messages between them, because Susan did not agree with attorney Milligan's independent professional views when it came to custody

---

[12] None of the nine exhibits in support of Susan's request to dismiss minor's counsel are included in the record.

and visitation. Stephen noted that minors already had been interviewed by FCS in January 2019, and thus argued that another interview, much less on an emergency basis, was unnecessary.

Susan on July 24 filed her third request for a domestic violence restraining order within about a nine-month period. She again alleged Stephen engaged in sexual misconduct with minors. As was the case in her December 28, 2018 request for such an order, Susan reported the alleged incident to CWS and law enforcement.[13] As before, Susan sought a change in custody and visitation in connection with her renewed request. However, unlike her previous two requests, this time the court refused to issue a temporary restraining order, ruling: "These issues have previously been raised in this case. Rulings concerning these issues were adverse to Petitioner. This is a custody and visitation issue."

On July 29 attorney Milligan filed a statement of issues, contentions, and proposed disposition of the case. Without waiving the attorney-client privilege, attorney Milligan apprised the court of "the sentiment" conveyed to her by minors and minors' mental health professionals to assist the court in determining minors' best interest.

Attorney Milligan in her statement noted she had met individually with Susan and Stephen, and with minors at their respective schools, which she viewed as a neutral location. Attorney Milligan obtained and read all the reports from CWS. She also met with B.C.'s school counselor; S.C.'s individual therapist; B.C.'s individual therapist; Stephen's wife; and

---

[13] We note even *before* this latest referral the FCS report documented a total of 12 prior referrals to CWS, nine of which were received after October 1, 2018. Stephen was alleged to have been the perpetrator in five of the nine referrals. None of the referrals against Stephen, including this most recent one, was substantiated.

detectives from the San Diego Police Department child abuse unit and sex crimes division. Attorney Milligan unsuccessfully attempted to meet with S.C.'s school counselor, and left a message for S.C.'s cheer coach that was never returned. Attorney Milligan noted Stephen had completed the court-ordered anger management course, as he produced a certificate of completion dated March 14, 2019.

As of March 2019, attorney Milligan reported that she had not received any evidence of any conduct by Stephen that rose to the "level of a TRO[,] nor had [she] received any corroborated evidence or concerns substantiating the need for supervised visits"; that minors and their father would benefit from "therapeutic intervention, not just due to the dearth of contact for several months but to assist them in the future in terms of opening the lines of communication so that [minors] felt empowered to tell their father what makes them uncomfortable or otherwise how to meet their emotional needs"; that while Stephen's conduct "did not rise to the level of a safety risk, he could benefit from some education on boundary-setting and parenting teenage daughters"; and that Susan's "ability to properly understand, appreciate and convey her daughters' needs and preferences as they related to Father" was concerning.

Regarding the latter point (and without waiving the privilege), attorney Milligan in her statement noted that the information she was receiving from minors was "not congruent" with the information Susan was relaying about how minors felt about their father; that once all the investigations of Stephen by CWS and law enforcement found no wrongdoing, instead of Susan viewing those results as "good news" she "continued with the narrative that Father was not safe for the girls"; and that despite the conclusion of professionals—both "individually and independently"—that Stephen's conduct was "not as

14

egregious or abusive as [Susan] had initially thought," she in response "return[ed] to court with renewed vigor."

Attorney Milligan's statement then included a series of proposals, including therapy for minors and the parties, and allowing for overnight visits between minors and their father that, if successful, could lead to "equal timeshare, again assuming no articulated concerns by the mental health professionals to minor's counsel."

Attorney Milligan noted that B.C., on a scale of 1 to 10 with 10 being the safest, reported being an "8/9" when at her father's home; and that S.C. reported being an "8." Attorney Milligan also noted both girls "denied any inappropriate touching constituting sexual abuse" by their father.

Attorney Milligan's statement then addressed events occurring after the March 2019 hearing. She noted that Susan had not provided any proof of enrolling in court-ordered therapy; that she remains concerned Susan is compromising the attorney-client relationship between minor's counsel and minors, including lodging their actual communications in support of Susan's litigation strategy; and that she had concerns regarding the April 21 and June 17 type-written letters allegedly prepared by minors.

Attorney Milligan's statement includes myriad reasons why she doubted minors prepared either letter. Specifically, she noted that the letters were both "quite sophisticated" and included the "name, address and contact information for their specific judicial officer, especially because it has changed since the beginning of the case and even since [her] appointment"; that she doubted minors' pediatrician would suggest minors write the court directly, as set forth in the April 21 letter, as opposed to seeking advice from their appointed legal counsel and/or their mental health professionals; and that although the April 21 letter stated minors had seen no improvement in

15

their father's behavior, as of that date minors "had not even had their first conjoint session with Father, thus making it impossible for them to have seen any improvement," nor had they "experienced any time in their Father's physical care (although . . . they had exchanged some text messages)."

Attorney Milligan also detailed her communication with the conjoint therapist. Attorney Milligan, as allowed by court order, even attended one of the therapy sessions with Stephen and minors in June 2019. The therapist reported that Susan "sends her numerous emails about the girls' feelings about Father, and then most recently about the new CWS referral." Susan also advised the therapist she could no longer afford to pay her share of therapy costs and thus was reluctant to schedule another conjoint session.

Attorney Milligan added, "[B]ased upon [the therapist's] first contact with the girls, she would never have seen the current situation occurring, namely, the almost outright refusal to have contact with Father. She got the impression that these girls wanted a relationship with their Father and while there were issues to address, the severity was not like she sees in other cases. She experienced the girls to be motivated and articulate . . . . [The therapist] confirmed to me that she did not see any indication of discomfort or unwillingness to disclose any issues with me" during the June 24 session she attended.

Attorney Milligan in her statement did not feel the need to respond or defend herself from Susan's myriad accusations. Attorney Milligan nonetheless noted that minors have confided in her and she is unable or unwilling to disclose those privileged communications; that Susan thus has made a series of "suppositions and conclusions, either based upon what [minors] then tell her, or based upon what she wants to hear or believe"; and

16

that other than usurping privileged messages between minors and attorney Milligan, Susan has no way of knowing what minors tell her.

Attorney Milligan added that at no time had minors' therapist reported minors being uncomfortable while being represented by attorney Milligan; that at no time have minors told attorney Milligan they did not trust her or did not want her to continue as their appointed counsel, or that they considered her rude and condescending, as Susan had alleged; that she has never "bad-mouthed their mother to them, nor ha[s she] bad-mouthed their father"; that she ascertains what minors "would like [her] to relay and not to relay—to the Court"; and that time and again minors have articulated to her and CWS they would like the litigation between their parents to "cease."

In the conclusion section of her statement, attorney Milligan recommended that if she was removed from the case, the court should continue to involve a neutral professional "not just to work with the family but also to advise the Court," as she felt "strongly" that without such an individual "the relationship between [minors] and Father may becom[e] increasingly more difficult to mend." She added, "This relationship has been deteriorating quickly, over just the past year, and the evidence does not appear to point in the direction—solely—of Father or his lack of efforts. Father is not the victim in this case, however, and he continues to have areas in which he needs to work with his individual therapist and the conjoint therapist. But my clients deserve a relationship with their Father and they are the true victims of the constant CWS referrals, inconsistent therapeutic interventions, numerous legal proceedings and parents unwilling, or unable, to co-parent and work collaboratively with each other and the professionals for the best interests of their daughters."

Attorney Milligan also concluded Susan was "either unable or unwilling" to allows minors to have a relationship with their father, "perhaps for fear that it will impact her relationship with her daughters, among other reasons. It doesn't seem as though she sees the value—for her daughters—in mending that relationship and allowing [minors] a relationship with both parents." As such, Milligan recommended the court consider appointing an Evidence Code section 730 evaluator to address attorney Milligan's concerns and "ensure these father-daughter relationships aren't ignored or severed forever."

At the July 31 hearing on Susan's motion to dismiss minor's counsel, the minute order shows the court's tentative was to deny that motion and for attorney Milligan to continue as appointed counsel. The minute order also shows the parties agreed to allow the court on August 26 to interview minors in camera, with a court reporter present and the contents of the interview sealed.[14]

Susan on August 16 renewed her request for an increase in child support and sought payment of money she claimed Stephen owed her. Susan lodged 59 exhibits in support of this request.[15] That same day, Susan filed a *49 page* "declaration" in further support of her motion to dismiss attorney Milligan as minor's counsel. The record shows minors were interviewed by the court on August 26, with the transcript sealed.

---

14    We note Susan sought to augment the record to include the sealed transcript of minors' August 26 court interview. We granted in part that request but when Susan did not pay for the transcript as required by the superior court, we ordered the case to proceed without the transcript.

15    As before, none of the 59 exhibits are included in the record.

18

Susan on September 13 filed yet another "declaration" in support of her motion to dismiss attorney Milligan. Susan's seven-page declaration was more of the same, as she complained about Stephen, and the alleged irreversible emotional trauma he was causing minors who allegedly did not want to be with him; about Stephen's lawyer, who allegedly was trying to take advantage of a "single, disabled mother who is self-represented"; (emphasis omitted); and about attorney Milligan, including asking the court to reject any additional reports by her after minors' August 26 interview.

In anticipation of the September 20 hearing, attorney Milligan on September 16 filed a supplemental statement updating the court since the last hearing. Attorney Milligan noted minors had consented to allow her to share the substance of their most recent conjoint therapy session with their father. In that session, minors discussed the incident in a clothing store with their father that had led Susan to call CWS and law enforcement. Minors noted that with the "Me Too" movement, they were hypervigilant about anyone touching them, including their father, who during the session stated he innocently had touched S.C. while "simply leading her through the store."

Attorney Milligan relayed that when minors told their mother about the store incident, she blew it out of proportion and called police, "even when *both* girls were begging her not to call the police." Both S.C. and B.C. stated during the session that a restraining order against their father was unnecessary; that their mother "assigns every incident, behavior or comment to being a symptom or a disorder that needs to be labeled and treated"; that their mother "often wants to define their mood swings as abnormal and symptomatology that needs further assessment and treatment" when they "just feel they have normal teenage angst and mood swings"; that their mother at times will even look up diagnoses with them "and try to figure

19

out . . . what disorder they have"; that they "are exhausted about talking with Mother—and anyone else, at this point—about Father, and their mood swings and the legal process"; and that they feel safe with their father and "ideally" would like to "spend time with him together, as siblings."

The minute order from the September 20 hearing shows the court, after hearing from the parties, affirmed its tentative and denied Susan's motion to dismiss attorney Milligan as minor's counsel.[16] The minute order also provided that conjoint therapy would continue twice a month, and at the therapist's discretion as to manner; that the parent who was in the better position to transport minors would provide the transportation; and that all previous orders regarding custody remained in effect. Finally, it noted Susan had declined to move forward with her renewed request for a domestic violence restraining order against Stephen.

## DISCUSSION

### A. *Presumption of Correctness*

On appeal we presume the trial court's judgment or order is correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) The appellant bears the burden of demonstrating otherwise. (*Spitler v. Children's Institute International* (1992) 11 Cal.App.4th 432, 442.) "As the party challenging a discretionary ruling, [appellant has] an affirmative obligation to provide an adequate record so that we [can] assess whether the court abused its discretion." (*Wagner v. Wagner* (2008) 162 Cal.App.4th 249, 259 (*Wagner*).) Although Susan is in propria persona, she is held to the same "restrictive procedural rules as an attorney." (*Leslie v. Board of Medical Quality Assurance* (1991) 234 Cal.App.3d 117, 121.)

---

[16] The court's September 20 minute order was memorialized in a January 31, 2020 order after hearing, which order is the basis of this appeal.

20

Where, as here, "no reporter's transcript has been provided and no error is apparent on the face of the existing appellate record, the judgment [or order] must be conclusively presumed correct as to all evidentiary matters. To put it another way, it is presumed that the unreported . . . testimony would demonstrate the absence of error. [Citation.]" (*Estate of Fain* (1999) 75 Cal.App.4th 973, 992 (*Fain*), italics omitted.) Thus, without a reporter's transcript of the September 20, 2019 hearing when the court denied both Susan's request for full legal custody of minors and to dismiss attorney Milligan as minor's counsel, we must presume the court heard and relied on testimony supporting both rulings. For this reason alone, Susan has failed to meet her burden on appeal to affirmatively demonstrate reversible error. (See *Wagner*, *supra*, 162 Cal.App.4th at p. 259.)

In any event, the record contains ample evidence to support the court's tacit finding that it was in the best interest of minors for their father Stephen to share with Susan legal custody of their daughters.

B. *Custody*

1. Guiding Principles and Analysis

Under California's statutory scheme governing child custody and visitation determinations, our overarching concern is the best interest of the child. (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255.) Trial courts and families are provided wide discretion in choosing a parenting plan without any presumptions or preferences for or against joint custody. (§ 3040, subd. (c).)

"The standard of appellate review of custody and visitation orders is the deferential abuse of discretion test. [Citation.] The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child." (*In re Marriage of Burgess*

21

(1996) 13 Cal.4th 25, 32 (*Burgess*).) " 'Where minds may reasonably differ, it is the trial judge's discretion and not that of the appellate court which must control.' " (*In re Marriage of Lewin* (1986) 186 Cal.App.3d 1482, 1492.) A family court's order must be affirmed as long as it is within the bounds of reason and within the range of options allowed by relevant criteria, and is not an " ' "arbitrary, capricious, or patently absurd determination." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

In reviewing a child custody order for abuse of discretion, we apply the substantial evidence standard to the trial court's factual findings. (*Burgess*, *supra*, 13 Cal.4th at p. 32.) In so doing, we view the evidence in the light most favorable to the order. (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1151.)

2. Analysis

Here, substantial record evidence supports the court's finding that it was in minors' best interest for Stephen to share legal custody of minors with Susan. The record shows minors, who are teenagers, wanted to have a relationship with their father, as they expressed in their January 2019 interview with FCS, and through their conjoint therapist and minor's counsel. (See § 3042, subd. (a) ["If a child is of sufficient age and capacity to reason so as to form an intelligent preference as to custody or visitation, the court shall consider, and give due weight to, the wishes of the child in making an order granting or modifying custody or visitation"].)

Indeed, on a scale of 1 to 10, with 10 being the safest, B.C. stated she was at an "8/9," and her sister S.C. at an "8," in terms of feeling safe when with their father during visits in his home. Both girls denied any inappropriate touching by Stephen of a sexual nature; and both said "ideally" they would like to spend time with him together, "as siblings."

22

Moreover, the record shows the court interviewed minors in camera on August 26, less than a month before the court ruled that Susan and Stephen would continue to share legal custody of minors. Although the sealed transcript of the interview was not included in the record, we must presume during this interview that minors likewise expressed a desire to continue visitation and have a relationship with their father, despite their mother's repeated allegations otherwise. (See *Fain*, *supra*, 75 Cal.App.4th at p. 992 [recognizing that without a reporter's transcript, a judgment or order must be conclusively presumed correct as to all evidentiary matters].)

What's more, the record shows FCS recommended Stephen share custody of minors with Susan, based in part on the January 2019 interview of minors. According to attorney Milligan and the conjoint therapist, minors and their father also were making progress to "mend" their relationship; that minors also shared this view; that this relationship was important for minors' well-being; and that Stephen had taken steps to improve his relationship with his daughters, including completing a court-ordered anger management class.

Also according to attorney Milligan, Susan was either "unable or unwilling" to allow minors to have a relationship with their father, and to recognize it was in the best interest of minors to have a relationship with *both* parents. Attorney Milligan found concerning that Susan was failing to heed the wishes of minors for the fighting between their parents to "cease," as minors had grown weary of discussing their father, custody and visitation issues, and the legal process.

The court raised similar concerns in at least two of its minute orders when it noted Susan was using the "DVTRO process" as "leverage" in the ongoing custody dispute with Stephen, a point borne out by the lengthy

23

record in which Susan on three occasions within about a nine-month period sought a domestic violence restraining order against Stephen, while at the same time seeking full custody of minors through that process and separately through various requests for orders. We thus conclude substantial evidence supports the court's finding it was in minors' best interest for their parents to share legal custody, ending the custody issue once and for all.

Susan's opening brief goes into great detail summarizing the "evidence" she proffered in her myriad court filings—without including in the record the supporting exhibits, as we have noted—to show the court abused its discretion when it ordered the parties to share legal custody of minors. We have summarized that "evidence" in our lengthy factual summary based on our independent review of the record.

Although, as we have noted, Susan is appearing in propria persona in this appeal, her status as such does not exempt her from the rules of appellate procedure or relieve her of their burden on appeal. (See *Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 984; see also *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1247 (*Nwosu*) [noting self-represented litigants "must follow correct rules of procedure" and their failure to do so forfeits any challenge on appeal].)

As part of that burden, Susan was obligated to provide a statement of facts in her opening brief in conformance with California Rules of Court,[17] rule 8.204(a)(2)(C), which requires a "summary of the significant facts limited to matters in the record." Under this rule, Susan was required to "summarize *all* the evidence presented" in the hearing(s) to change custody and/or dismiss attorney Milligan. (See *Silva v. See's Candy Shops, Inc.* (2016) 7 Cal.App.5th 235, 260, italics added; *Schmidlin v. City of Palo Alto*

---

[17] All further rule references are to the California Rules of Court.

(2007) 157 Cal.App.4th 728, 738 (*Schmidlin*) [recognizing that a " 'party who challenges the sufficiency of the evidence to support a particular finding must summarize the evidence on that point, favorable *and unfavorable*, and show how and why it is insufficient' " (italics added), or risk having the claim of error forfeited on appeal].)

Susan's factual summary in her opening brief is decidedly one-sided, in contrast to the record evidence. By way of example only, Susan's summary of the content of attorney Milligan's July 29 statement was limited to the following two sentences: "Milligan's statement primarily focused on custody-related issues and not issues raised in Appellant's moving papers. Milligan did not discuss any disclosures of abuse made by her clients to CWS or SDP[D]."

Susan *neglected* to mention that in this statement minor's counsel reported she saw no evidence of any conduct by Stephen that supported issuance of a restraining order or any corroborated evidence substantiating the need for supervised visits between him and minors; that minor's counsel came to this conclusion after reading all the reports from CWS, meeting with minors, the child abuse and sex crimes unit of the San Diego Police Department, and others; that without waiving the attorney-client privilege, the information minor's counsel was receiving from minors was "not congruent" with the information Susan was relaying about how minors felt about their father and allegedly not wanting to have a relationship with him; that the minors felt safe when visiting their father in his home and *denied* any inappropriate touching constituting sexual abuse by him; and that the conjoint therapist also communicated to minor's counsel that minors wanted a relationship with their father.

Clearly, Susan's description in her opening brief of the contents of minor's counsel's July 29 statement does not satisfy her burden to present all material evidence on the issues she raises in this appeal. (See *Nwosu*, *supra*, 122 Cal.App.4th at p. 1247; rule 8.204(a)(2)(C).)[18] As such, Susan on appeal forfeits any claim of error based on the alleged lack of substantial evidence it was in minors' best interest for their parents to share legal custody.

Also evident from Susan's opening brief is her attempt to reargue the evidence in this case and, in so doing, to ask this court to reweigh the credibility of witnesses and to make new findings based on the conflicting record "evidence."[19] This we cannot do. In a substantial evidence challenge to the findings of the trier of fact, such as made by Susan in the instant case,

---

[18] As noted, this is just one example of Susan's failure in her brief to summarize all the material evidence on a point, whether favorable or unfavorable to her position. (See *Schmidlin*, *supra*, 157 Cal.App.4th at p. 738.) Another similar example derives from attorney Milligan's September 16 supplemental statement. Susan described the substance of this statement as presenting selected excerpts from "confidential conjoint therapy sessions" attended by minor's counsel on June 24 and August 2. What Susan does not acknowledge, however, is that minors had consented to allow attorney Milligan to disclose the "substance" of what was said during the therapy sessions; that minors had "beg[ged]" their mother not to call CWS and/or police in connection with the clothing store incident involving their father; that minors reiterated feeling safe when they were with their father in his home; that minors together wanted to spend time with their father; that minors were "exhausted" talking with their mother about their father, the legal process, and their mood swings, and just wanted to be normal teenagers; and so on. (See *ibid.*)

[19] We note a great deal of the "evidence" Susan relies on in her opening brief is derived from the exhibits she lodged in connection with her requests for restraining order and/or her requests for sole legal custody of minors. However, as we have noted *ante*, with very limited exceptions the lodged exhibits are *not* included in the record on appeal, and thus cannot be used as evidentiary support for her claim of error.

we may not reweigh the evidence, are bound by the credibility determinations of the trier of fact, and must liberally construe findings of fact to support the judgment or order. (See *In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 93–94.)

Because we have found ample evidence in the record to support the court's tacit finding that the best interest of minors was for their parents to have joint legal custody, we reject Susan's claim the court abused its discretion in denying her motions for a change in custody.

C. *Minor's Counsel*

Sections 3150 through 3153, and rules 5.240 through 5.242,[20] govern the appointment of independent counsel for a minor in a custody proceeding. "If the court determines that it would be in the best interest of the minor child, the court may appoint private counsel to represent the interests of the child in a custody or visitation proceeding, provided that the court and counsel comply with the requirements set forth in [the applicable] Rules of Court." (§ 3150, subd. (a).)

A minor's counsel has a legal and ethical obligation to represent the minor's best interests and is charged with making " 'a reasonable, independent determination of the minor's best interests.' " (*In re Alexandria P.* (2016) 1 Cal.App.5th 331, 358 (*Alexandria*).) Section 3151, subdivision (a) outlines the role and duties of a minor's independent counsel. They include gathering "evidence that bears on the best interests of the child, and present[ing] that admissible evidence to the court in any manner appropriate

---

[20] "[R]ule 5.240 . . . sets forth specific factors the court should take into account in determining whether to appoint minor's counsel. . . . Rule 5.241 addresses the proper payment of the minor's counsel, and . . . [r]ule 5.242 addresses the qualifications, rights and responsibilities of the minor's counsel." (*In re Marriage of Metzger* (2014) 224 Cal.App.4th 1441, 1446.)

for the counsel of a party" (§ 3151, subd. (a)); and "interviewing the child, reviewing the court files and all accessible relevant records available to both parties, and making any further investigations as the counsel considers necessary to ascertain evidence relevant to the custody or visitation hearings." (*Ibid.*)

Subdivision (c) of section 3151 sets forth the rights of minor's counsel. As relevant here, they include: "(2) Standing to seek affirmative relief on behalf of the child"; "(4) The right to take any action that is available to a party to the proceeding, including, but not limited to, the following: filing pleadings, making evidentiary objections, and presenting evidence and being heard in the proceeding, which may include, but shall not be limited to, presenting motions and orders to show cause, and participating in settlement conferences, trials, seeking writs, appeals, and arbitrations. (5) Access to the child's medical, dental, mental health, and other health care records, school and educational records, and the right to interview school personnel, caretakers, health care providers, mental health professionals, and others who have assessed the child or provided care to the child. The release of this information to counsel shall not constitute a waiver of the confidentiality of the reports, files, and any disclosed communications"; "(7) The right to assert or waive any privilege on behalf of the child. (8) The right to seek independent psychological or physical examination or evaluation of the child for purposes of the pending proceeding, upon approval by the court."

Susan wisely does not claim the court abused its discretion in appointing minor's counsel in the first instance. Several factors favored such appointment in this case, including among others that "child custody and visitation are highly contested or protracted" (rule 5.240(a)(1)); a child is "subjected to stress as a result of the dispute that might be alleviated by the

28

intervention of counsel representing" him or her (*id.*, (a)(2)); minor's counsel "would be likely to provide the court with relevant information not otherwise readily available or likely to be presented" (*id.*, (a)(3)); and the dispute "involves allegations of physical, emotional, or sexual abuse" (*id.*, (a)(4)).

Susan also does not claim attorney Milligan was unqualified for the appointment.

Instead, she claims the court erred by considering attorney Milligan's July 29 statement and her supplemental September 16 statement because they relied on hearsay.

First, we note that Susan only objected on hearsay grounds to a single paragraph in the July 29 statement describing attorney Milligan's conversation with B.C.'s school counselor, in which the counselor stated B.C. had difficulty remembering things the same as other students at her grade level. The record is silent whether the court sustained this single hearsay objection.

In any event, a single objection to one paragraph in the July 29 statement, or a few sentences within that paragraph, does not preserve on appeal the issue of whether both statements are inadmissible on hearsay grounds. (See Evid. Code, § 353 [providing a "verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"]; see also *Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 397 [noting it " 'is hornbook law that a timely and specific objection is required to prevent the consideration of certain evidence' "].)

Therefore, we conclude this claim of alleged error is forfeited on appeal, at least with respect to the portions of the two statements Susan did not object to on hearsay grounds.  (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293 (*S.B.*) [noting a "reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court," and further noting the "purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected"].)

Second, both of attorney Milligan's reports are based on interviews she personally conducted, including with minors.  Any information attorney Milligan obtained from minors was confidential, subject to the attorney-client privilege (see Evid. Code, § 952[21]), as minor's counsel herself noted in her July 29 statement when she was careful not to waive the privilege but instead merely described the overall "sentiment" of her interviews with minors and their mental health professionals.  (See § 3151, subd. (c)(7) [recognizing the right of minor's counsel to assert or waive any privilege on behalf of his or her client].)  In our view, attorney Milligan properly used this

---

[21]    Evidence Code section 952 provides:  "As used in this article, 'confidential communication between client and lawyer' means information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship."

privileged information in her role as minors' independent counsel in addressing their best interest when it came to custody and visitation.[22]

Third, attorney Milligan had a legal and ethical obligation to make an " 'independent determination' " regarding minors' best interest. (See *Alexandria, supra*, 1 Cal.App.5th at p. 358.) In order to do so, attorney Milligan had a statutory duty to gather evidence that "bears on the best interests of the child." (§ 3151, subd. (a).) Such information-gathering included interviewing minors, the parties, school personnel, and mental health care professionals among others (*id.*, subds (a) & (c)(5)); and "reviewing the court files and all accessible relevant records available to both parties, and making any further investigations as the counsel considers necessary to ascertain evidence relevant to the custody or visitation hearings." (*Id.*, subd. (a).)

We conclude in the instant case that attorney Milligan's was merely fulfilling her legal and ethical obligation to independently represent the best interest of minors when she prepared the two statements. The two statements summarized for the court the substance of Milligan's statutorily required investigative efforts; expressed the "sentiment" of minors based on minor's counsel's interviews with them and their mental health professionals;

---

[22] We reach the same conclusion with respect to the *confidential* information attorney Milligan received from CWS, which information she also properly relied on in representing minors' interests in the custody and visitation dispute between the parties. (See cover letters from CWS attached as exhibits A & B to attorney Milligan's July 29 statement, which letters in part state: "[A] juvenile case file, any portion thereof, and information relating to the content of the juvenile case file, may not be made as an attachment to any other documents without the prior approval of the presiding judge of the juvenile court, unless it is used in connection with and in the course of a criminal investigation or a proceeding brought to declare a person a dependent child or ward of the juvenile court."

stopped short of making a recommendation regarding who should have custody of minors, while emphasizing minors wanted to have visitation with their father "as siblings"; and viewed the importance of minors having a relationship with their father, and of their mother's unwillingness or inability to appreciate the importance of minors having a relationship with *both* parents.

Attorney Milligan's statements properly reflect her role as an advocate for minors, in contrast to a report by a child custody evaluator. (See rule 5.220(h)(1) [noting a child custody evaluator among other things must "[m]aintain objectivity, provide and gather balanced information for both parties, and control for bias"]; see also § 3111, subd. (a) [providing in part that a court "may appoint a child custody evaluator to conduct a child custody evaluation in cases where the court determines it is in the best interest of the child"].)

Fourth, even *if* the court erred in admitting either or both statements, and in relying on what Susan claims are inappropriate recommendations made by minor's counsel—a point on which we disagree, as noted, the record shows there was ample other evidence available to the court in deciding the best interest of minors as it pertains to custody and visitation. (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609 [noting that in the "absence of a contrary showing in the record, all presumptions in favor of the trial court's action will be made by the appellate court"].)

Most important, this other evidence included the March 12, 2019 FCS report recommending the parents have joint custody over minors (assuming Susan's then-allegation of domestic violence was unsubstantiated, as turned out to be the case); *and* the court's August 26 in camera interview of minors,

which took place less than a month before it ruled on, and ultimately denied after a lengthy hearing, Susan's renewed request for full legal custody.

In addition, the court itself was acutely aware of the circumstances of this case, as it had designated as early as December 2018 the parties' custody and visitation dispute as "high-conflict" when it appointed attorney Milligan to represent minors. In making this appointment, the court found minors were caught in the middle of the conflict and expressed concern that Susan was using the "DVTRO process" as "leverage for C/V orders," as we have noted. All of this information was available to the court when it denied at the September 20 hearing Susan's request to assume sole legal custody of minors.

Thus, even if it was error to admit and rely on attorney Milligan's July 29 and September 16 statements, including any alleged recommendations therein, we conclude that error was harmless because it was not reasonably probable the exclusion of the statements would have resulted in a more favorable outcome for Susan. (See *McCoy v. Board of Retirement* (1986) 183 Cal.App.3d 1044, 1054 [noting error in admission of evidence " 'is not prejudicial if the evidence "was merely cumulative or corroborative of other evidence properly in the record," ' or if the evidence 'was not necessary, the judgment [or order] being supported by other evidence' [citations omitted]"; see also *People v. Watson* (1956) 46 Cal.2d 818, 836 [recognizing that a " 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].)

Susan also claims that attorney Milligan should be dismissed because she allegedly failed to present the minors' wishes regarding custody and visitation to the court. We disagree.

33

We note attorney Milligan's statements covered minors feelings about wanting to have a relationship with their father and them feeling safe when in his home. That Susan disagreed with minor's counsel statements is plain, but does not mean, ipso facto, that minors' wishes were not respected by their appointed attorney.

Indeed, attorney Milligan noted the lack of "congruent" information she was receiving from minors and what Susan was saying minors felt and wanted as it concerned their father. In any event, as we have also noted the court heard first-hand from minors during the August 26 in camera interview. Thus, because the court was certainly apprised of minors' wishes when it ruled to deny Susan's request for sole legal custody, we find this claim of error unavailing.

Finally, Susan claims her multiple requests to dismiss attorney Milligan as minor's counsel created a conflict of interest that required the court to remove her from the case. Again we disagree. Attorney Milligan represents the interests of minors, *not* those of Susan. Merely because Susan filed such motions, and/or argued that attorney Milligan was biased and accused her of other alleged improper conduct, did not create a conflict of interest between minor's counsel and minors. In any event, the court clearly found attorney Milligan was fulfilling her obligation to competently represent minors' interest in connection with custody and visitation. We thus also find this claim of error unavailing.

## DISPOSITION

The court order denying both Susan's motion for sole legal custody of minors and her motion to dismiss attorney Milligan as minor's counsel is affirmed.  The parties are to bear their own costs of appeal.


BENKE, Acting P. J.

WE CONCUR:



IRION, J.



DATO, J.